J-S19032-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.J.S., III, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.S. FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 164 WDA 2026 |

Appeal from the Decree Entered January 14, 2026
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
O.A. NO. 25 of 2024

| | | |
|---|---|---|
| IN THE INTEREST OF: J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 165 WDA 2026 |

Appeal from the Order Entered December 24, 2025
In the Court of Common Pleas of Butler County Juvenile Division at
No(s):  CP-10-DP-0000123-2022

BEFORE:  SULLIVAN, J., NEUMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED: August 11, 2026**

Appellant, J.S. ("Father"), appeals from the January 14, 2026, decree

which involuntarily terminated his parental rights to his son, J.J.S., III, a/k/a

---

[*] Former Justice specially assigned to the Superior Court.

J.S. ("Child"), born in September 2021.[1]  Father also appeals from the December 24, 2025, order that changed Child's permanency goal from reunification to adoption.  After our careful review, we affirm.

The relevant facts and procedural history are as follows: On December 5, 2022, Butler County Children and Youth Services ("CYS") received a general protective services ("GPS") report alleging that Mother had overdosed on illicit substances at the home of R.C., Child's maternal grandmother ("Maternal Grandmother"), and that Parents had bags of heroin accessible to Child.  **See** N.T., 4/28/25, at 68, 77. Parents had resided at Maternal Grandmother's home with Child, as well as Child's half-siblings, since approximately 2019.[2] **See id.** at 67-68.  Due to Maternal Grandmother's presence in the home, CYS did not immediately seek the removal of either Child or his half-siblings from Parents' care and implemented in-home services for the family.  **See id.** at 70.

On December 29, 2022, Father submitted to a drug screen, and the results were positive for cocaine, opiates, and fentanyl.  **See id.** at 70-72. Mother acknowledged on that date that she also used illicit substances.  **See**

---

[1] Child's mother, A.C. ("Mother") (collectively with Father, "Parents"), voluntarily relinquished her parental rights by order dated December 22, 2025.  Mother did not appeal or participate in this appeal.

[2] Child's half-siblings are not subjects of the instant appeal. Child and his half-siblings have the same biological mother; however, they have different biological fathers.

*id.* Therefore, CYS sought emergency protective custody of Child on December 29, 2022, which the juvenile court granted. At a shelter care hearing the following day, the court placed Child in the legal and physical custody of CYS. Specifically, the court placed Child with Maternal Grandmother and prohibited Parents from residing there.

On January 18, 2023, the court adjudicated Child dependent and continued his placement in kinship care with Maternal Grandmother where he remained through the conclusion of the termination proceedings.[3] *See id.* at 143. The court established Child's initial permanency goal as reunification. In furtherance thereof, the court ordered Father to, *inter alia*: attend random drug screens, attend mental health evaluations/treatment, attend drug and alcohol evaluations/treatment, participate in supervised visitation, and obtain stable housing. *See* N.T., 1/16/25, at 19.

From January 2023 to January 2024, Father failed to communicate with CYS, and CYS was largely unable to contact him as a result. *See* N.T., 4/28/25, at 161-62, 167, 172-73. As such, during the first year of Child's dependency, Father did not comply with his permanency plan or make progress towards alleviating the circumstances that led to Child's removal from his care. *See id.* at 161-62, 167-68.

---

[3] The court also placed Child's half-siblings in Maternal Grandmother's home. *See* N.T., 4/28/25, at 72.

In January 2024, Father was involved in an altercation wherein he was struck in the head with a pipe. *See id.* at 35. As a result, he suffered a traumatic brain injury and a stroke. *See id.* at 36. Father required multiple brain surgeries and was hospitalized for approximately four months. *See id.* Following his discharge from the hospital, Father began to reside with Child's paternal grandfather, J.J.S. ("Paternal Grandfather"). *See id.* at 38-39.

Father's injury caused significant cognitive impairment that persisted at the time of the termination of parental rights proceedings. Further, Father's prognosis is unknown. *See id.* at 52, 60.

According to Paternal Grandfather, Father goes through a routine each day wherein Paternal Grandfather reminds Father that he is the parent of Child. *See id.* at 37. Paternal Grandfather testified that Father cannot be left alone. *See id.* at 36. Specifically, he testified that Father cannot operate the stove without supervision because he may cause a fire. *See id.* at 59. Paternal Grandfather also testified that Father cannot be permitted to leave the home alone because he may forget where he is going and/or how to get home. *See id.* at 59-60. Due to his cognitive impairments, Paternal Grandfather stated that Father cannot care for Child. *See id.* at 52, 56, 60. Paternal Grandfather also stated that he hired a professional caregiver to assist him in his care and supervision of Father. *See id.* at 36, 63-64.

While Father did not attend supervised visitation prior to his injury, in August 2024, he began to participate in biweekly one-hour visitation with

Child, who was nearly three years old. *See id.* at 103-05. Because Father's cognitive impairment prohibited him from traveling alone, either Paternal Grandfather or Father's caregiver accompanied him to visitations with Child. *See id.* Jessica Dickey, the visitation supervisor, testified that Father required assistance "pretty regularly, with anything that [Child] may need." *Id.* at 104. Specifically, she explained that Father had difficulty "setting limits" for Child, particularly when Child became "a little bit aggressive with [Father] and hit him." *Id.* at 103.

On April 22, 2024, CYS filed a petition seeking the involuntary termination of Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On July 16, 2024, CYS filed a petition requesting the juvenile court change Child's permanency goal from reunification to adoption. On August 2, 2024, the court appointed Child's guardian *ad litem* ("GAL") from the dependency proceedings, Susan B. Lope, Esquire, as his sole counsel in the termination proceedings.[4]

_____

[4] Section 2313(a) of the Adoption Act "requires the appointment of counsel who serves the child's legal interests in contested, involuntary [termination of parental rights] proceedings." *In re Adoption of L.B.M.*, 161 A.3d 172, 180 (Pa. 2017) (footnote omitted). In cases where the orphans' court appoints one attorney "to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the orphans' court made a determination that those interests did not conflict." *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020). Our Supreme Court has explained that "where a child's legal and best interests do not diverge in a termination proceeding, an attorney-GAL representing the child's best interests can also fulfill the role of the attorney appointed per Section 2313(a) to represent the
*(Footnote Continued Next Page)*

The orphans' court held a combined evidentiary hearing on CYS's petitions on January 16, 2025, April 28, 2025, and May 30, 2025.[5] On the first date of the hearing, prior to the parties presenting their evidence, the court conducted *in camera* interviews of Child and his half-siblings off-the-record in the presence of Attorney Lope. Thereafter, CYS presented the testimony of various CYS employees, including Eric Stover, Michelle Womer, Paige McCracken, Randall Russell, Ms. Dickey, and Donna Cosme, who supervised Child's placement with Maternal Grandmother. Father was represented by counsel. The court also appointed him a GAL due to his brain injury. *See* Order, 6/19/24. Father did not testify but presented the testimony of Paternal Grandfather.

By decree dated December 22, 2025, and entered on January 14, 2026, the orphans' court involuntarily terminated Father's parental rights to Child

_____

child's legal interests." *In re T.S.*, 192 A.3d 1080, 1088 (Pa. 2018) (citation omitted).

Here, the orphans' court appointed Attorney Lope to represent Child's legal and best interests. *See* Order 8/2/24. The orphans' court confirmed that no conflict existed between Child's dual interests. *See* Orphans' Court Opinion ("O.C.O."), 12/22/25, at 1. As such, we conclude that Child's right to counsel pursuant to Section 2313(a) was satisfied in this case.

[5] The orphans' court also presided over the involuntary termination petitions filed by CYS with respect to the respective natural fathers for Child's half-siblings. On July 17, 2025, the court conducted a final evidentiary hearing relating only to Child's half-siblings. The orphans' court did not require the presence of Father and his counsel at the hearing, and so they did not appear or present any evidence. As such, Father closed his case-in-chief on May 30, 2025. *See* N.T., 5/30/25, at 53.

pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The court contemporaneously filed an opinion explaining its rationale. Additionally, the court changed Child's permanency goal from reunification to adoption by order dated November 13, 2025, and entered on December 24, 2025.

On January 23, 2026, Father timely filed separate notices of appeal along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The orphans' court filed a Rule 1925(a) opinion on February 24, 2026.

On appeal, Father presents the following issues for review:

I.     Did the trial court commit an error of law by interviewing Child without placing the interview on the record?

II.    Did the trial court commit an abuse of discretion and error of law in finding that Father's continued incapacity warranted termination under Section 2511(a)(5) without considering the role of the parental bond in the child's life?

III.   Did the trial court commit an abuse of discretion in finding by clear and convincing evidence that father displayed conduct continuing for a period of at least six (6) months immediately preceding the filing of the petition for involuntary termination of parental rights which evidence a settled purpose of relinquishing his parental claim to Child or refused or failed to perform parental duties during that time under Section 2511(a)(1)?

IV.    Did the trial court error and commit an abuse of discretion in finding by clear and convincing evidence that the conditions that led to the removal or placement of Child continue to exist, Father cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to Father are not likely to remedy the conditions which led to the removal or placement of Child within a reasonable period of time, and

- 7 -

termination of parental rights would best serve the needs and welfare of Child under Section 2511(a)(5)?

V.     Did the trial court commit an abuse of discretion in finding by clear and convincing evidence that the conditions that led to the removal or placement of Child continue to exist and termination of parental rights would best serve the needs and welfare of Child under Section 2511(a)(8)?

VI.    Did the trial court abuse its discretion in changing Child's goal from reunification to adoption?

Father's Brief at 5-6.[6]

Our standard of review in involuntary termination of parental rights cases is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (cleaned up).

_____

[6] We note with displeasure that Attorney Lope did not file a brief on Child's behalf in this appeal.

In his first issue, Father contends that the orphans' court erred in failing to conduct the January 16, 2025, *in camera* interview of Child on-the-record. *See* Father's Brief at 14. Father baldly asserts that "by failing to make a record of what was said, it significantly impair[ed] this [C]ourt's ability to determine if the court's conclusions comport with the law." *Id.* at 15-16. Finally, Father contends that the court erred by conducting the interview without his counsel being present. *See id.* at 14-15.

The Juvenile Act controls the adjudication and disposition of dependent children. *See In re R.P.*, 957 A.2d 1205, 1217 (Pa.Super. 2008). Concerning permanency review hearings, the Juvenile Act provides the following:

> **§ 6351. Disposition of dependent child**
>
> . . .
>
> **(e) Permanency hearings.--**
>
> (1) The court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. **In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan, including the child's desired permanency goal, in a manner appropriate to the child's age and maturity.** If the court does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan have been ascertained to the fullest extent possible and communicated to the court by the guardian ad litem under section 6311 (relating to guardian ad litem for child in court proceedings) or, as appropriate to the circumstances of the case by the

child's counsel, the court-appointed special advocate or other person as designated by the court.

42 Pa.C.S.A. § 6351(e)(1) (emphasis added). "Upon motion by any party or on the court's own motion, *in camera* proceedings are to be recorded and each party's attorney shall be present." Pa.R.J.C.P. 1134.

Our review of the certified record reveals that at no time during the subject proceeding did Father's counsel object to the court's decision to proceed off-the-record with the *in camera* interview and without counsel's presence. Therefore, Father has waived this claim. ***See*** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised on appeal.").

In addition, with respect to his claim that the court erred in conducting the *in camera* interview without his counsel being present, Father has also waived it by failing to raise the claim in his concise statement of errors complained of on appeal. ***See*** Concise Statement, 1/23/26. Likewise, Father does not raise it in his statement of questions involved in his brief. ***See*** Father's Brief at 5-6. As such, we conclude that Father has waived this argument. ***See In re M.Z.T.M.W.***, 163 A.3d 462, 466 (Pa.Super. 2017) ("We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved, and any issue not raised in a statement of matters complained of on appeal is deemed waived.") (citing ***Krebs v. United Refining Co. of Pa.***, 893 A.2d 776, 797 (Pa.Super. 2006) (citations omitted)).

- 10 -

We next turn to Father's second through fifth issues, which challenge the orphans' court's findings pursuant to Section 2511(a) and (b). The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 620 Pa. 602, 682, 71 A.3d 251, 267 (2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See M.E.*, 283 A.3d at 830 (citing *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*)).

In this case, as set forth above, the orphans' court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Father has preserved in his concise statement and set forth or suggested in his statement of questions involved in his brief issues relating to all of these statutory provisions except Subsection 2511(a)(2). Thus, Father has waived any claim concerning this subsection, and we must

therefore affirm the decree under Section 2511(a). ***See M.Z.T.M.W.***, 163 A.3d at 466.

Even if Father had preserved a challenge to Section 2511(a)(2), we would conclude that it is without merit. This subsection provides as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

In order to satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re Adoption of A.H.***, 247 A.3d 439, 443 (Pa.Super. 2021). Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." ***Id.*** (citing ***In re Z.P.***, 994 A.2d 1108, 1117 (Pa.Super. 2010)). Overall, we emphasize that "[p]arents are required to make diligent efforts

toward the reasonably prompt assumption of full parental duties." ***A.H.***, 247 A.3d at 443.

It is important to note that Section 2511(a)(2) provides the statutory basis for "terminating involuntarily the rights of a parent with a physical or mental impairment." ***In re Adoption of J.J.***, 511 Pa. 590, 607, 515 A.2d 883, 892-93 (1986). In ***J.J.***, our Supreme Court emphasized, "the focus in such cases is the effect which an impairment has on the person's ability to provide parental care, not the mere fact of impairment. . . ." ***Id.*** at 893. "The fact that a parent suffers from a physical or mental disability is not, and never was, the only relevant factor in determining whether his or her parental rights should be terminated, or whether there should be a different legal standard applied." ***Id.***

Here, the orphans' court aptly found as follows:

There is no dispute of fact that Father is cognitively impaired, due to the head injury he suffered in January 2024. Paternal Grandfather confirms his son is wholly incapable of caring for Child without receiving adult assistance. Prior to sustaining the debilitating brain injury, the evidence, or lack of it, reveals Father did not provide any parental care for Child. On the contrary, the testimony reveals Maternal Grandmother assumed all parenting duties. Unfortunately, Father's mental infirmities brought on by brain trauma supersede any reasonable chance he can remedy the situation.

Either Paternal Grandfather or a caregiver must keep a watchful eye on Father's actions. For example, he cannot use an oven or stove for fear of him forgetting to monitor cooking, resulting in a fire hazard. Father is unable to leave Paternal Grandfather's home alone and go for a walk because Father may get lost. Father's long-term prognosis for partial or full recovery of his cognitive abilities is unknown. While he continues with weekly therapy

- 13 -

> sessions, Father continues to forget he has a child and the day of the week. Father previously neglected all parenting responsibilities before January 2024. It remains clear Child will be without parental care, and this condition assuredly cannot be remedied by Father.

O.C.O., 12/22/25, at 22 (cleaned up). The orphans' court's findings are fully confirmed by Paternal Grandfather's testimony which has been set forth above. *See* N.T., 4/28/25, at 36-37, 52, 56, 59-60, 63-64.

Based upon our thorough review of the certified record, we discern no abuse of discretion by the conclusion of the orphans' court that Father's repeated and continued incapacity as a result of his cognitive impairments have caused Child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being. *See J.J.*, 515 A.2d 883, 892-93. In addition, the record confirms that Father's incapacity cannot or will not be remedied inasmuch as his condition has not improved, and his prognosis is unknown. Therefore, even if Father had not waived any claim under Section 2511(a)(2), we would discern no abuse of discretion in the court's determination that termination was warranted pursuant to this subsection.

Because the orphans' court concluded that adequate grounds for termination existed pursuant to Section 2511(a), the court appropriately turned to Section 2511(b), which provides the following:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

Section 2511(b) requires an orphans' court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 620 Pa. at 682, 71 A.3d at 267. Our Supreme Court has directed that a Section 2511(b) inquiry must include consideration for the bond between the parent and the child. *In re E.M.*, 533 Pa. 115, 123, 620 A.2d 481, 485 (1993). Our Supreme Court has further explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Interest of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023). The "severance of a necessary and beneficial relationship [is] the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id.* at 1109-10. The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010).

This Court has recognized that,

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is

- 15 -

able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted).

The *K.T.* Court stated that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. Further, orphans' courts "must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 1106.

It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *M.E.*, 283 A.3d at 839. Further, this Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." *Id.* We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *See id.*

Regarding Section 2511(b), Father contends that CYS failed to meet its evidentiary burden because Child enjoys his visits with Father and their

relationship is not a "hinderance" to Child. Father's Brief at 24-25. Father also argues that the orphans' court failed to appropriately analyze the bond between him and Child, as well as the impact termination would have on Child. *See id.* at 25-26.

The orphans' court made the following findings with respect to Section 2511(b).

> To some extent, Father and Child share an emotional bond, according to the credible testimony of Father's visitation supervisor, Jessica Dickey. Paternal Grandfather also believes his son and grandchild share some observable emotional connection. However, ". . .the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *T.S.M.*, 620 Pa. at 682, 71 A.3d at 267. . .
>
> Child's need for safety, stability, and permanency clearly outweigh any resulting harm to Child caused by severing any existing bond with Father, who at times does not remember he has a son. Father's impaired cognition remains an unfortunate ongoing factor to terminate any existing bond. There is no evidence that Father may even partially recover from the serious brain trauma sustained in January 2024. On the other hand, there clearly exists an immeasurably stronger bond, not only between Child and Maternal Grandmother, but also between Child and his half-siblings, who also live with her. The evidence indicates Father demonstrated very little interest in Child's health, safety, and welfare, prior to sustaining the injury. Father was never involved with Child to any recognizable degree.
>
> Child's involvement with CYS approximates nearly three years. He is safe, secure, protected from harm, loved, and nurtured living with Maternal Grandmother, who provides the stability and continuity Father cannot offer. Regrettably, Child may suffer some loss with the termination of Father's parental rights. However, the court must ultimately be especially keen to Child's best interest by ensuring safe, stable, and permanent home for him, free from Father's total disregard of minimal parenting prior to suffering brain trauma in January 2024, and subsequently the injury involuntarily impacting his cognitive function.

O.C.O., 12/22/25, at 27-28. The orphans' court's findings are supported by the record.

Ms. Dickey, visitation supervisor, testified that following Child's removal, and prior to Father's injury, Father did not participate in supervised visitation or have any other contact with Child. *See* N.T., 4/28/25, at 101-02. She testified that Father did not begin participating in supervised visitation until August 2024, which occurred biweekly for one hour. *See id.* at 102-03. Ms. Dickey stated that Child and Father are excited to see each other and play together during the visits. *See id.* at 104. However, she testified that at the conclusion of the visit, Child appears "ready to go." *Id.* at 107.

Ms. Cosme, who supervised Child's placement in kinship care, testified that Child has been placed with Maternal Grandmother since his removal from Father in December 2022. *See id.* at 143. Ms. Cosme stated that Maternal Grandmother is "proactive" in meeting all of Child's needs, including, *inter alia*, taking Child to medical examinations, playing with him, making meals, and providing overall support. *Id.* at 144. She further testified that Maternal Grandmother provides Child with safety, affection, advice, and stability. *See id.* at 145.

Based upon the foregoing, it is clear that the orphans' court adequately considered the bond between Father and Child and determined that it was not necessary and beneficial for Child. *See K.T.*, 296 A.3d at 1109-10.

Therefore, we discern no error or abuse of discretion in the court's conclusion that CYS met its evidentiary burden pursuant to Section 2511(b).

We next turn to Father's sixth and final issue, wherein he argues that the court abused its discretion in changing Child's permanency goal from reunification to adoption. We likewise review this issue under the standard of abuse of discretion. *See In re R.J.T.,* 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010). When considering a petition for a goal change for a dependent child, the juvenile court must determine the matters set forth at 42 Pa.C.S.A. § 6351(f) of the Juvenile Act. *See In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011). In making these determinations, "[t]he best interests of the child, and not the interests of the parent, must guide the trial court." *Id.* at 1089.

In this case, given our disposition of Father's appeal from the termination decree, we conclude that his appeal from the goal change order is moot. *See Interest of A.R.*, 311 A.3d 1105, 1114 (Pa.Super. 2023) (holding that the affirmance of termination of parental rights renders an appeal of the goal change to adoption moot). Accordingly, we dismiss the goal change order appeal as moot.[7]

_____

[7] Even if not moot, we would conclude that Father waived any claim regarding the goal change order for failure to provide an argument relating to it in his brief. *See In re M.Z.T.M.W.*, 163 A.3d at 465-66 (citations omitted) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief and supported by citations to relevant authority.").

- 19 -

Thus, we affirm the decree involuntarily terminating Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b). We dismiss Father's appeal from the goal change order as moot.

Decree affirmed. Appeal from goal change order dismissed as moot.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

8/11/2026